**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 99-cv-02152-REB-KLM

MICHAEL BUNTON,

     Applicant,

v.

EUGENE ATHERTON, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

     Respondents.

---

**ORDER ADOPTING RECOMMENDATION OF UNITED STATES
MAGISTRATE JUDGE, DENYING MOTION FOR EVIDENTIARY HEARING,
AND DENYING APPLICATION FOR WRIT OF HABEAS CORPUS**

---

**Blackburn, J.**

     This matter is before me on the following: (1) the applicant's **Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody** [#5][1] filed November 5, 1999; (2) the **Recommendation of United States Magistrate Judge** [#29] filed April 12, 2001; (3) the applicant's **Motion for Evidentiary Hearing on the Issue of Whether any Procedural Default Should be Excused Because Mr. Bunton is Actually Innocent** [#44] filed November 26, 2003. The respondents filed their **Answer to Show Cause Order** [#15] on January 31, 2000. The applicant filed two documents [#17 & #18] in which he responds to the arguments in the respondents' answer. The respondents filed objections [#31] to the magistrate judge's recommendation, and the applicant filed

---

[1] "[#5]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

objections [#32] to the magistrate judge's recommendation.

After the recommendation and objections were filed, the court entered an order [#33] appointing the Federal Public Defender to represent the applicant.  The Federal Public Defender then conducted an investigation and filed a **Supplemental Pleading in Support of Mr. Bunton's Previously Filed Objection to the Recommendation of the United States Magistrate Judge** [#42] on November 26, 2003, as well as the applicant's **Motion for Evidentiary Hearing on the Issue of Whether any Procedural Default Should be Excused Because Mr. Bunton is Actually Innocent** [#44] on November 26, 2003.  The respondents filed an opposition [#45] to the applicant's motion for evidentiary hearing.

On March 14, 2007, shortly after this case was reassigned to me, I entered an order denying without prejudice the applicant's motion for an evidentiary hearing [#44].  I noted in that order that I would review the voluminous record and concomitant information in that motion and in this case, and would determine the proper resolution of the applicant's motion for evidentiary hearing.  In that motion, the applicant, Michael Bunton, argues that he is entitled to a hearing to determine whether any procedural default of the issues raised in his present habeas corpus application should be excused because he is actually innocent.

I have reviewed carefully both the record in this case and the applicable. law.  As required by 28 U.S.C. § 636(b), I have reviewed *de novo* all portions of the recommendation to which objections have been filed, and I have considered carefully the recommendation, the objections, and the applicable law.  In addition, because the applicant was proceeding *pro se* during much of the time this case has been pending, I have construed his *pro se* pleadings and filings more liberally and held them to a less

stringent standard than formal pleadings drafted by lawyers. ***See Erickson v. Pardus***, 551

U.S. 89, ___, 127 S. Ct. 2197, 2200 (2007); ***Andrews v. Heaton***, 483 F.3d 1070, 1076

(10th Cir. 2007); ***Hall v. Bellmon***, 935 F.2d 1106, 1110 (10th Cir. 1991).

The magistrate judge's recommendation is detailed and comprehensive.  The

respondents filed an objection [#31] challenging one of the magistrate judge's conclusions

on a specific issue related to one of the applicant's ineffective assistance of counsel

claims.  I sustain the respondents' objection and reject the magistrate judge's

recommendation as to this specific issue only.  Otherwise, I agree with the magistrate

judge's analysis and conclusions, and I find and conclude that the arguments advanced,

authorities cited, and findings of fact, conclusions of law, and recommendations proposed

by the magistrate judge should be approved and adopted.  The applicant filed objections

[#32] to the recommendation, acting *pro se.*  After counsel was appointed, the applicant

filed his **Supplemental Pleading in Support of Mr. Bunton's Previously Filed**

**Objection to the Recommendation of the United States Magistrate Judge** [#42] on

November 26, 2003.  I have reviewed these objections carefully.  I find that the objections

[#32 & #42] are without merit, and I overrule them.

The applicant's **Motion for Evidentiary Hearing on the Issue of Whether any**

**Procedural Default Should be Excused Because Mr. Bunton is Actually Innocent**

[#44] raises issues that were not addressed in the recommendation because this motion

was filed after the recommendation was filed and after counsel was appointed for the

applicant.  I conclude that the applicant's motion for evidentiary hearing must be denied.

Ultimately, I conclude that the applicant is not entitled to the relief he seeks.  I deny

the applicant's motion for an evidentiary hearing.  With one exception, specified below, I

approve and adopt the magistrate judge's recommendation, and I dismiss the application

for a writ of habeas corpus.

## I. JURISDICTION

I have jurisdiction over this matter under 28 U.S.C. § 2254(a).

## II. FACTS

On November 21, 1986, a Denver District Court jury found the applicant, Michael Bunton, guilty of first degree murder. Bunton was sentenced to life imprisonment. The magistrate judge provides in her recommendation an accurate summary of the evidence presented at trial. Recommendation, pp. 1-6. I will not repeat that summary here, although I do review some of the trial evidence in this order .

## III. CLAIMS

Bunton's application, which he filed while acting *pro se*, is over 100 pages long. Much of the application is a narrative description of Bunton's claims. In their Answer to Show Cause Order [#15], the respondents indicate that they read Bunton's application as asserting fourteen claims, including certain separate grounds for claims one and nine. In her recommendation, the magistrate judge gave letter designations to the separate grounds asserted in support of claims one and nine. The magistrate judge analyzed the application as asserting the claims and grounds designated by the respondents in their answer. I find that the respondents' analysis of the application is reasonable, and I have analyzed the application as asserting the fourteen claims designated in the respondents' response and the magistrate judge's recommendation. Bunton has not raised any objection to the designation of claims and grounds proposed by the respondents. I will not outline in this order each of Bunton's claims because they are outlined accurately in both the magistrate judge's recommendation and in the respondents' answer.

## IV.  TIMELINESS OF PETITION, EXHAUSTION OF STATE
## COURT REMEDIES, & PROCEDURAL DEFAULT

### A.  Timeliness of Petition

I agree with the respondents that Bunton's application was filed within the applicable one year statute of limitations.  28 U.S.C. § 2244(d).

### B.  Exhaustion & Procedural Default Standards

Generally, exhaustion of available and adequate state court remedies is a prerequisite to a habeas corpus petition in federal court.  ***Granberry v. Greer***, 481 U.S. 129 (1987); ***Rose v. Lundy***, 455 U.S. 509 (1982); 28 U.S.C. § 2254(b).  State remedies are not deemed exhausted until the highest state appellate courts have had an opportunity to consider the merits of the claim that the petitioner seeks to present in federal court.  ***See Pitchess v. Davis***, 421 U.S. 482 (1975).  The exhaustion of state remedies requirement in federal habeas cases dictates that a state prisoner must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  ***O'Sullivan v. Boerckel***, 526 U.S. 838, 845 (1999).

Generally, a federal court should dismiss unexhausted claims without prejudice so that the petitioner can pursue available state-court remedies. ***See Demarest v. Price***, 130 F.3d 922, 939 (10th Cir.1997).  If the state court to which a petitioner must present his claims in order to meet the exhaustion requirement "now would find those claims procedurally barred, there is a procedural default for the purposes of federal habeas review."  ***Dulin v. Cook***, 957 F.2d 758, 759 (10th Cir.1992); ***see also Bland v. Sirmons***, 459 F.3d 999, 1012 (10th Cir. 2006).

> In all cases in which a state prisoner has defaulted his federal claims in state
> court pursuant to an independent and adequate state procedural rule, federal

habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A claim of "fundamental miscarriage of justice" now often is viewed as requiring a claim of "actual innocence." *See, e.g., Herrera v. Collins*, 506 U.S. 390, 404 - 405 (1993).

### C. Procedural Default, Cause & Prejudice

The respondents argue that Bunton has procedurally defaulted claim one, grounds b), c), f), h), k), l), m), n), o), p), q), r), s), and t), because Bunton did not raise those components of an ineffective assistance of counsel claim in his direct appeal, in his motion under Rule 35(c) of the Colorado Rules of Criminal Procedure, or in his appeal of the denial of his Rule 35(c) motion. The respondents argue also that Bunton has procedurally defaulted his claims two through twelve. The magistrate judge concluded correctly that Bunton has procedurally defaulted each of these claims, noting that if Bunton sought to assert any of these claims in a state motion for post conviction relief, the motion would be denied under state procedural rules that bar successive post conviction motions. *Recommendation*, p. 10. I agree with the magistrate judge's analysis and conclusion.

Bunton argues that he has shown cause and actual prejudice concerning his failure to raise before the state trial and appellate courts all of the procedurally defaulted claims he asserts in his present application. Bunton argues that constitutionally deficient representation by his counsel at trial and in post-trial proceedings constitutes cause for his default. Analyzing this argument, the magistrate judge noted that "appellate counsel's failure to raise an issue on direct appeal of a criminal conviction will be deemed constitutionally deficient and prejudicial to the prisoner only if the omitted issue was a

'dead-bang winner.'" *Recommendation*, p. 11, quoting **Moore v. Gibson**, 195 F.3d 1152, 1180 (10th Cir. 1999).  In **Moore**, the court said that a dead-bang winner is an issue which is obvious from the trial record and one which would have resulted in reversal on appeal. **Moore**, 195 F.3d at 1180, **citing U.S. v. Cook**, 45 F.3d 388, 395 (10th Cir. 1995).

In his **Supplemental Pleading in Support of Mr. Bunton's Previously Filed Objections to the Recommendation of the United States Magistrate Judge** [#42], Bunton notes that the United States Court of Appeals for the Tenth Circuit disavowed the definition of a dead-bang winner, as stated in **Moore v. Gibson**, in an opinion issued after the magistrate judge filed the recommendation.  In **Neill v. Gibson**, the Tenth Circuit concluded that requiring a habeas applicant to show that the omitted claim would have resulted in his obtaining relief on appeal was not the correct standard.  Rather, the court concluded, an applicant must show that there was a "reasonable probability the omitted claim would have resulted in a reversal on appeal." 278 F.3d 1044, 1057 n. 5 (10th Cir. 2001).  In describing the applicable standard, the magistrate judge described a dead-bang winner as an issue that "probably would have resulted in reversal on appeal." *Recommendation*, p. 11. With her use of the word "probably" in describing the dead-bang winner standard, the magistrate judge essentially described the standard later adopted in **Neill**.

To ensure that the applicable standard, the standard stated in **Neill**, is applied correctly in this case, I have reviewed the magistrate judge's analysis of each claim to which the magistrate judge applied the dead-bang winner analysis.  These claims are claim one, grounds c), f), h), o), p), q), r), s), t), claims two through twelve, and claim fourteen.  As to each of these claims, and on the grounds outlined by the magistrate judge, I conclude that Bunton has not demonstrated that there was a "reasonable probability the

omitted claim would have resulted in a reversal on appeal." **Neill**, 278 F.3d at 1057 n. 5.

Therefore, Bunton has not shown cause for his procedural default of these issues.

In this circumstance, Bunton can pursue these claims in a habeas application only if he demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice. **Coleman v. Thompson**, 501 U.S. 722, 750 (1991). This is the issue addressed in Bunton's **Motion for Evidentiary Hearing on the Issue of Whether any Procedural Default Should be Excused Because Mr. Bunton is Actually Innocent** [#44], which was filed after the recommendation was filed and after counsel was appointed to represent Bunton. I address the fundamental miscarriage of justice exception below.

## V. FUNDAMENTAL MISCARRIAGE OF JUSTICE EXCEPTION

In his application Bunton argues that his procedurally defaulted claims should be heard on the merits because failure to consider these claims would result in a fundamental miscarriage of justice. Bunton argues that failure to hear his claims would result in a fundamental miscarriage of justice because he is actually innocent. In this context, a claim of actual innocence "is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." **Herrera v. Collins**, 506 U.S. 390, 404 (1993). The magistrate judge addressed this issue in the recommendation, addressing the arguments asserted by Bunton acting *pro se*. The magistrate judge concluded that Bunton has not made a colorable showing that the fundamental miscarriage of justice exception is applicable in this case. I agree with the magistrate judge's analysis and conclusion.

After the recommendation was filed, the court appointed counsel to represent Bunton and after counsel conducted an investigation of the case, Bunton filed his **Motion for Evidentiary Hearing on the Issue of Whether any Procedural Default Should be**

8

**Excused Because Mr. Bunton is Actually Innocent** [#44].  In this motion Bunton argues that new evidence submitted with the motion satisfies the fundamental miscarriage of justice exception or, alternatively, demonstrates that the court should hold a hearing to determine if the new evidence obtained by Bunton's appointed counsel satisfies the fundamental miscarriage of justice exception.  I have reviewed Bunton's argument in his motion for evidentiary hearing,  the new evidence submitted by Bunton with his motion for evidentiary hearing, the respondents' opposition [#45] to Bunton's motion for evidentiary hearing, and the record in this case.  I conclude that Bunton has not satisfied the fundamental miscarriage of justice exception and is not entitled to a hearing to present new evidence in an effort to satisfy that exception.

<u>A.  Standard of Review</u>

> (T)he fundamental miscarriage of justice exception is an extremely narrow exception, implicated only in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent.  To prevail, [a habeas applicant] must identify evidence that affirmatively demonstrates his innocence.  A criminal defendant is required to provide evidence that does more than simply undermine the finding of guilt against him or her.

*Phillips v. Ferguson*,  182 F.3d 769, 774 (10th Cir. 1999) (quotations and citations omitted).  Further, to fall within the fundamental miscarriage of justice exception, the applicant "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

A habeas applicant who seeks to demonstrate that he falls within the fundamental miscarriage of justice exception must "support his allegations of constitutional error with new reliable evidence –  whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence –  that was not presented at trial." *Schlup*, 513 U.S. at 324.  Applying the standard established in *Schlup*, the newly

presented evidence may call into question the credibility of witnesses presented at trial. *Schlup*, 513 U.S. at 330. In this circumstance, the habeas court may have to make some credibility assessments. Further, in determining whether to grant a hearing to a habeas applicant seeking to meet the *Shlup* standard, the court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Id*. at 331 - 332. This may include consideration of "how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id*. Second, the *Schlup* standard focuses on the likely behavior of reasonable jurors in light of the new evidence. *Id*. The fact that the record contains sufficient evidence to support a conviction is not determinative under *Schlup*. *Id*. at 869. Rather, the habeas court must determine if it is more likely than not that no reasonable juror would have convicted the applicant in light of the new evidence. *Id*. at 327.

As noted by the respondents in their opposition [#45] to Bunton's motion for evidentiary hearing, there is some debate about the standards that should be applied to determine whether a habeas applicant is entitled to an evidentiary hearing to establish either cause and prejudice or fundamental miscarriage of justice, in an effort to show that procedurally defaulted claims should be heard on the merits by a habeas court. I conclude that, at minimum, Bunton is entitled to a hearing only if his motion demonstrates the existence of evidence sufficient to satisfy the fundamental miscarriage of justice exception. Alternatively, Bunton could establish entitlement to a hearing if he shows that additional evidence could be presented at an evidentiary hearing and that evidence would demonstrate his actual innocence. *See, e.g., Cristin v. Brennan*, 281 F.3d 404, 416 -417 (3rd Cir. 2002) (habeas applicant entitled to evidentiary hearing for purpose of establishing cause and prejudice if he has proffered specific facts sufficient to support such a finding).

Absent such a showing, a hearing is not warranted.

I conclude that Bunton is not entitled to a hearing because the evidence included with his motion for evidentiary hearing [#44] does not satisfy the fundamental miscarriage of justice exception. Further, Bunton has not demonstrated that he could present additional evidence at a hearing that would satisfy the fundamental miscarriage of justice exception.

B. Bunton's New Evidence

Bunton was convicted of murder based on the shooting of Jesse Harrington. Harrington was shot once in the head at close range on April 7, 1986. The shooting occurred near the intersection of 26th and Welton Streets in Denver's Five Points neighborhood. According to testimony at Bunton's trial, Harrington was seen standing with and talking to two other men on the sidewalk at the entrance to an alley and parking lot. The entrance led from the alley and parking lot onto 26th Street. One of the two other men pulled out a gun and shot Harrington in the head. A short time later, the two men dragged Harrington into a parking lot near the alley entrance. With his motion for evidentiary hearing [#44], Bunton has presented affidavits and other statements which Bunton claims constitute new evidence that demonstrates that he falls within the fundamental miscarriage of justice exception. Bunton's new evidence is described below.

**1. Darrell White** - Darrell White was one of two key eyewitnesses who testified at Bunton's trial. White testified that on the night of the murder he was working as a bouncer at the Ladies Choice Lounge, a nightclub located near the intersection of 26th and Welton Streets. R, Vol. V, pp. 111 - 112.[2] The door to the Ladies Choice was located on Welton

---

[2] References to the trial record, by volume and page number, are to the state court record in Criminal Action 86CR1111, *People v. Michael Bunton*, which record was transmitted to this court from the Denver District Court.

Street, between 25th Street and 26th Street.  At trial, White testified that he saw the shooting while he was sitting in his car, which was parked on Welton Street.  White said he was sitting on the passenger's side of the car with his leg up on the seat.  R, Vol. V, p. 125.  As he sat in his car, White saw Bunton, who he knew, come out of the Ladies Choice, walk down Welton toward 26th, and then down 26th to the area of the alley entrance where Harrington was shot.  Bunton then stood at that point.  R, Vol. V, pp. 125 - 126, 171 - 172.  A short time later, White saw Tyrone Speer and Jesse Harrington come out of the Ladies Choice and walk to the area where Bunton was standing.  R, Vol. V, pp. 126 - 127.  White observed what appeared to be a disagreement between Bunton and Harrington.  R, Vol. V, p. 128.

White then saw Bunton reach into his pants, pull out a revolver, and shoot Harrington while Bunton was standing roughly and arm's length away from Harrington.  R, Vol. V, pp. 129, 131.  Harrington then fell to the ground.  White said Bunton walked back to the corner of 26th and Welton after shooting Harrington, and then stood on the corner for a little while.  R, Vol. V, pp. 134 - 138.   Then, Bunton walked back to where Harrington was laying, and it appeared that Bunton and Speer dragged Harrington to an area that White could not see.  R, Vol. V, pp. 138 - 139.  Bunton and Speer then walked back toward White's car and as they passed the car, White heard Bunton warn Speer that he better "shut his mouth."  R, Vol. V, p. 140.  When he was interviewed by a detective, White identified Bunton as the person White saw shoot Harrington.  White told the defective that Bunton was wearing a brown suede fringed jacket at the time of the shooting.  White identified Bunton as the shooter at trial, and White testified that Bunton was wearing a distinctive brown suede jacket with fringe on the night of the shooting.  A brown suede jacket with fringe was admitted in evidence at Bunton's trial, and photographs of the jacket

are attached to Bunton's supplemental pleading [#42].

Shortly after the shooting, White drove his car down 26th Street, past the area where the shooting occurred.  He said he could see a person's legs sticking out from behind a dumpster.  R, Vol. V, p. 142.  White then drove around the block and back onto Welton Street, where he stopped.  At that point, White told Charles Butler, the manager of the Ladies Choice, that there had been a shooting .  White then went home.  R, Vol. V, pp. 141 - 143.

Bunton has submitted the affidavit of Aura Lee Wymore, dated November 26, 2003, in support of his motion for evidentiary hearing.  *Motion for evidentiary hearing* I[#44], Attachment I (Wymore Affidavit).  Wymore says she is an investigator employed by the Office of the Public Defender, and that she has been working with Bunton's counsel on this case.  Wymore says she and Bunton's counsel interviewed White twice, apparently in 2003.  Wymore reports that White made several statements concerning the night of Harrington's murder, but White would not sign an affidavit containing these statements. *Wymore Affidavit*, ¶ 8.  Wymore outlines White's statements in her affidavit.

According to Wymore,  White says that he was a serious abuser of crack cocaine at the time of the shooting, and that his crack use affected his ability to perceive events. White says that he saw the shooting of Harrington, but he now says that he was not and still is not sure that it was Bunton who shot Harrington.  He says also that he did not actually see the shooter wearing the distinctive brown suede jacket with fringe.  Rather, White says he did not see how the shooter was dressed.  Consistent with his trial testimony, White says he is certain that Speer was standing with Harrington when Harrington was shot.  White says he is certain of this because of the distinctive way that Speer dressed.

13

White also told Wymore that the police had contacted Crime Stoppers on White's behalf and that White ultimately received about 500 dollars from Crime Stoppers based on the information White provided about Bunton and the shooting of Harrington. White now says that he did not consciously alter his testimony in an effort to convict Bunton and receive the reward money, but "the possibility of obtaining money from Crime Stoppers may have affected his judgment," and may have caused him mistakenly to identify Bunton as the shooter. *Wymore Affidavit*, ¶ 6 (z).

**2. Carrie Bolling** - Carrie Bolling is the second key eyewitness who testified at Bunton's trial. Bolling testified that she lived in an apartment across 26th Street from where the shooting occurred. Bolling said that on the night of April 7, 1986, she was awakened from sleep by a loud noise. She went to her window and saw a many lying on the ground across the street. She said the man was lying with his head toward the street and his feet toward the parking lot. R, Vol. V, pp. 203 - 206. A short time later, Bolling watched as two men approached the man lying on the ground. Each of the two men who approached grabbed one of the feet of the man on the ground, and then the two men started dragging the man on the ground toward the back of the parking lot, away from the street. R, Vol. V, p. 205. Bolling said she recognized the two men who approached the man on the ground as men she had seen at the Ladies Choice, but she did not know their names. Bolling later identified Bunton's photograph in a photo lineup as one of the men she saw dragging the body, and Bolling so identified Bunton at trial. R, Vol. V, pp. 212 - 217.

Bunton has submitted an affidavit of Carrie Bolling, dated November 14, 2003, in support of his motion for evidentiary hearing. *Motion for evidentiary hearing* [#44], Attachment F (Bolling Affidavit). In her affidavit, Bolling describes what she saw on the night of April 7, 1986, and she summarizes her trial testimony in which she identified

Bunton as one of the two men who dragged Harrington into the parking lot. Bolling testified at trial that she was able to identify Bunton based on what she saw that night, and not because she later heard other people say that Bunton had shot Harrington. R, Vol. V, pp. 213 - 217.

In her affidavit, Bolling says that she believes "that I saw Mr. Bunton between what I observed from my bedroom window and when I spoke with the police, and that he was identified to me as the shooter. I believe that this is what led me to identify Mr. Bunton as one of the people I saw approach and drag the body." *Bolling Affidavit*, ¶ 8. Bolling says also that she does "not recall ever being asked to describe the clothing worn by the man who helped Mr. Speer drag the body. I distinctly remember that this second man was wearing a dark, long trench coat." *Id.*, ¶ 9. She says she has been shown a picture of the brown suede jacket with fringes that was admitted in evidence at Bunton's trial. Bolling says the jacket in the picture does "not match the trench coat in color or length, and the trench coat did not have fringes." *Id.*, ¶ 10.

**3. Patricia Juniel** - Bunton has submitted an affidavit of Patricia Juniel, dated November 19, 2003, in support of his motion for evidentiary hearing. *Motion for evidentiary hearing* [#44], Attachment A (Juniel Affidavit). Juniel says she was at the Ladies Choice on April 7, 1986, and that at about 11:10 or 11:15 p.m., she left the Ladies Choice and walked up Welton to an area near 26th and Welton Streets. While in that area, she heard a noise that she thought was a car backfiring. She continued walking on Welton and crossed 26th Street, walking toward 27th Street. While still near the intersection of 26th and Welton, Juniel looked down 26th Street and saw a man lying on the ground. She says she also saw a man walking down 26th toward Welton, and this man was putting away a gun. *Juniel Affidavit*, ¶¶ 7 - 9. Juniel says this man was a black man who was wearing a

black leather jacket.  *Id.*, ¶ 9.  Juniel says she saw the same man later that evening inside the Ladies Choice.  She is certain it was the same man.  *Id.*, ¶ 13.

Juniel was shown a photo lineup by the police.  Bunton's photo was included in the lineup, but Juniel was not able to identify anyone in the lineup.  Juniel says she is confident that she could have identified the man she saw putting away a gun if he had been in the photo array.

**4.  Johnny Ray Blackwell, Walter Springs, Patricia Juniel, & the position of White's car -** Bunton emphasizes that White could not have seen the area where the shooting took place unless White's car was parked on Welton Street, very close to 26th Street.  This is so because the building walls that run along Welton Street would have blocked White's view of the scene unless White was parked very close to 26th Street.  With this fact in mind, Bunton presents evidence that indicates that White's car was parked in a position from which White could not have seen the scene of the shooting.

Bunton has submitted an affidavit of Johnny Ray Blackwell, dated November 20, 2003, in support of his motion for evidentiary hearing.  *Motion for evidentiary hearing* [#44], Attachment B (Blackwell Affidavit).  Blackwell says he was at the Ladies Choice Lounge on April 7, 1986, but he left the Ladies Choice "relatively early in the evening."  *Blackwell Affidavit*, ¶ 2.  Blackwell says he did not see who shot Harrington because Blackwell was at a different lounge, the 715, during the latter part of the evening of April 7, 1986.  *Id.*, ¶ 10.  Blackwell says he knew White at that time and he knew the car that White drove.  It was an older model, black car.  Blackwell says he saw White's car when he left the Ladies Choice on April 7, 1986, and White's car was parked within a car length of the door of the Ladies Choice.  From that position, Blackwell says, it would not have been possible for White to see the scene of the shooting while sitting in the car.

Bunton has submitted an affidavit of Walter Springs, dated November 25, 2003, in support of his motion for evidentiary hearing. *Motion for evidentiary hearing* [#44], Attachment C (Springs Affidavit). Springs says he went to the Ladies Choice on April 7, 1986. According to Springs, as he walked down Welton Street toward the Ladies Choice, he encountered White. Springs says he knew White at the time. According to Springs, White was standing next to his car, which was an older model black sedan. Springs says he knew White's car because White often parked it in front of the Ladies Choice. When Springs met White on the evening of April 7, 1986, White told Springs that a man had just been shot in the area. *Springs Affidavit*, ¶ 6. Springs says he recalls distinctly that White's car was parked on Welton on the same side of the street as the Ladies Choice, and just slightly toward 26th Street from the door of the Ladies Choice. Springs says it would not have been possible to see the area where the shooting took place while sitting in White's car when parked in that position. *Springs Affidavit*, ¶ 8.

In her affidavit, discussed above, Patricia Juniel says she did not see a black Impala or Cadillac, or a similar looking car, parked at the corner of 26th and Welton Streets at the time of the shooting. She says she did see such a car parked closer to the door of the Ladies Choice Lounge. From where this car was parked, Juniel says, someone sitting in the car could not have seen the area where the shooting occurred. *Juniel Affidavit*, ¶¶ 22 - 23.

**5. Anthony Huff, Ronnie McClain -** Bunton has submitted an affidavit of Anthony Huff, dated November 18, 2003, in support of his motion for evidentiary hearing. *Motion for evidentiary hearing* [#44], Attachment E (Huff Affidavit). Huff says he was incarcerated in the Denver County Jail in the fall of 1986. While there, Huff called the Ladies Choice Lounge early one evening. White answered the phone, and Huff asked White why White

was saying that Bunton had shot Jesse Harrington.  According to Huff, White said he did not really see what happened, but that he was just going on what he had heard.  White said he could not go back to jail, and that he was lying because Robert Bell had told White to lie.

Bunton has submitted an affidavit of Ronnie McClain, dated November 19, 2003, in support of his motion for evidentiary hearing.  *Motion for evidentiary hearing* [#44], Attachment D (McClain Affidavit).  McClain says he was standing next to Huff when Huff made the phone call described above.  McClain says Huff asked White to repeat what White had said about the accusations White was making against Bunton.  Huff then handed the phone to McClain.  McClain heard White says that White could not go to the "joint" again, nor could his woman.  White said he and his woman had received a deal, and that he, White, was going to go ahead and do what they want me to do, testify.  McClain says he told Bunton about this conversation later that day.

**4. Murphy Miles -** As noted previously, Bunton has submitted the affidavit of Aura Lee Wymore, in support of his motion for evidentiary hearing.  *Motion for evidentiary hearing* [#44], Attachment I (Wymore Affidavit).  Again, Wymore says she is an investigator employed by the Office of the Public Defender, and that she has been working with Bunton's counsel on this case.  Wymore says that she and Bunton's counsel interviewed Miles twice.  Wymore describes in her affidavit specific statements she says Miles made.  However, she says Miles no longer will talk to her and apparently is not willing to sign an affidavit containing the statements she describes.

Miles told Wymore he shot Jesse Harrington on April 7, 1986.  According to Miles, he had a long-standing feud with Harrington and Harrington's friend, Tony Masterson.  Miles said he encountered Harrington and Masterson as Miles was entering the Ladies

Choice on April 7, 1986. Miles says Harrington came at Miles and the three men started pushing, shoving, and throwing punches. Miles says this fight took place in an entry area that separated the exterior door of the Ladies Choice from the club itself. Miles said he knew Harrington always carried a gun and, fearing that he could be killed, Miles drew his gun and shot Harrington. Miles says he and Tyrone Speer then dragged Harrington's body outside and around the corner to the parking lot next to the Black History Museum. They left the body by a dumpster.

### C. Analysis

I conclude that the new evidence cited by Bunton does not affirmatively demonstrate Bunton's innocence. Further, considering the trial evidence and the new evidence, I conclude that Bunton has not demonstrated that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. Absent such proof, Bunton's procedurally defaulted claims are barred.

The statements attributed to White in Wymore's affidavit contradict, to some extent, White's identification of Bunton as the man who shot Harrington. Notably, White has refused to sign an affidavit, and his purported statement comes to the court via Wymore's hearsay statement. In the mind of a reasonable fact finder, this fact can be seen as weakening substantially the credibility of White's purported statements. If these statements are credited, then White asserts that he was not and is not sure that it was Bunton who shot Harrington. Notably, White does not rule out the possibility that it was Bunton who shot Harrington. White says he was a crack addict and a heavy user of crack at the time of the murder, a factor that, he says, affected his ability to perceive what he saw on the night of April 7, 1986. Yet White remains certain of other facts. For example, he is certain that he saw the shooting and he is certain that it was Speer who was standing

with Harrington when Harrington was shot.

It readily is conceivable that a reasonable juror considering White's trial testimony, which was given about seven months after the murder, and the statements Wymore says White made in 2003, 17 years after the murder, would choose to credit White's trial testimony over his subsequent statements. This is true even if the reasonable juror also considered the statements by other witnesses described in Bunton's motion for evidentiary hearing. Notably, a reasonable fact finder readily can conclude that a statement made shortly after the relevant events is more credible than a contrary statement made many years after the relevant events. Nothing in White's new statements shows that it is more likely than not that no reasonable fact finder would have credited White's trial testimony over White's later statement or, more importantly, that no reasonable fact finder would have convicted Bunton in light of White's later statements and the later statements of other witnesses.

Similarly, it readily is conceivable that a reasonable juror considering Bolling's trial testimony, which was given about seven months after the murder, and the statements Bolling made in her affidavit, 17 years after the murder, would choose to credit Bolling's trial testimony over her subsequent statements. With many years of hindsight, Bolling now says she may have identified Bunton based on the fact that others had told her that Bunton shot Harrington. However, at trial, Bolling said she identified Bunton based on what she had seen, and not based on what others had told her. R, Vol. V, pp. 213 - 217. Again, a reasonable fact finder readily can conclude that a statement made shortly after the relevant events is more credible than a contrary statement made many years after the relevant events.

Bolling's says also that the man she identified was wearing a long black leather

coat, but she says she never was asked what this man was wearing during the police investigation or at trial. Bolling's statement about the black leather coat contradicts White's trial testimony that Bunton was wearing a brown suede fringed coat. Again, White now says he does not know what the shooter was wearing. In the context of the trial testimony, these later statements by White and Bolling, and the later statements of other witnesses, a reasonable fact finder could reach a variety of conclusions. Crediting White's earlier testimony, one such conclusion is that Bunton was wearing a brown suede fringed jacket, and Bolling was mistaken. Crediting the later statements, another reasonable conclusion could be that Bunton was wearing a long dark leather jacket, White was mistaken in describing Bunton's coat, but White's identification of Bunton still was correct.

Given this array of reasonable conclusions, I find that nothing in Bolling's new statements shows that it is more likely than not that no reasonable fact finder would have credited Bolling's and/or White's trial testimony over Bolling's later statement or, more importantly, that no reasonable fact finder would have convicted Bunton in light of Bolling's later statements and the later statements of other witnesses.

Juniel says she could have identified the man she saw walking away from the shooting and putting away a gun, had she been shown a photo of that man at the time of the original investigation. The photo array shown to Juniel at the time of the original investigation included Bunton's photo, but she did not identify Bunton. In addition, Juniel says this man was wearing a black leather jacket. Considering the trial testimony, the statements in Juniel's affidavit, and the later statements of other witnesses, a reasonable fact finder could reach a variety of conclusions based on these statements. One such conclusion, crediting the trial testimony of White and Bolling, is that Juniel simply was mistaken when she failed to identify Bunton's photo as the man she saw putting away a

gun and saw later in the Ladies Choice. Another conclusion is that Juniel incorrectly assumed that this man was the shooter based on statements the man later made inside the Ladies Choice. Given the array of reasonable conclusions, I find that nothing in Juniel's statement shows that it is more likely than not that no reasonable fact finder would have credited Juniel's non-identification of Bunton over Bolling's and/or White's trial testimony and identification of Bunton or, more importantly, that no reasonable fact finder would have convicted Bunton in light of Juniel's later statements and the later statements of other witnesses.

The statements of Johnny Ray Blackwell, Walter Springs, and part of Patricia Juniel's statement all concern the position of White's car at the time of the shooting. Blackwell says he saw where White's car was parked earlier in the evening, but Blackwell was not at the Ladies Choice when the shooting happened, and he did not see White's car at or near the time of the shooting. Springs saw White and his car a short time after the shooting. What Springs saw does not clearly indicate where White's car was at the time of the shooting because White testified that he drove his car around the block shortly after the shooting, and then parked again on Welton street. Springs saw White standing next to his car with the car parked on Welton, and a reasonable juror readily could conclude that Springs saw White and his car after White had driven around the block. Blackwell and Springs' statements do not provide strong evidence about the location of White's car at the time of the shooting.

Finally, Juniel does not say that she knew what kind of car White drove at the time, but she does say that she did not see a black Impala or Cadillac, or a similar car, parked on the corner of 26th and Welton Streets at the time of the shooting. She says she did see such a car parked closer to the door of the Ladies Choice Lounge and that, from that

location, a person in the car could not have seen the scene of the shooting.  Juniel's statement contradict's White's testimony about the location of White's car at the time of the shooting.

Considering the trial testimony, the statements of Blackwell, Springs, and Juniel, and the later statements of other witnesses, a reasonable fact finder could reach a variety of conclusions concerning the location of White's car at the time of the shooting.  One such conclusion is that White was correct about the location of his car at that time.  It was White's car and he testified at trial, and says in his more recent statement, that he was inside of the car at the time of the shooting and he could see the shooting from where his car was parked.  Juniel was simply walking down the street at that time and she has given no indication that she had any reason to pay particular attention to cars parked on the street.  Nothing in the statements of Blackwell, Springs, or Juniel, considered individually or together, shows that it is more likely than not that no reasonable fact finder would have credited White's trial testimony concerning the location of his car at the time of the shooting over the statements of Blackwell, Springs, and Juniel on this topic, or more importantly, that no reasonable fact finder would have convicted Bunton in light of Blackwell, Springs, and Juniel's later statements and the later statements of other witnesses.

Anthony Huff and Ronnie McClain both say they talked to White about his identification of Bunton a short time after Harrington was murdered.  Again, Huff says White told Huff that White did not see the shooting, that White was just going on what he had heard, and that White was lying because Robert Bell told White to lie. McClain says White told McClain that White and "his woman" could not go back to the joint, and that White was going to "go ahead and do what they want me to do, testify."  *McClain Affidavit*,

¶ 5.  The implication of this statement is that White and his girlfriend received favorable treatment in their own criminal cases based on White's testimony.

Considering the trial testimony, the statements of Huff and McClain, and the later statements of other witnesses, a reasonable fact finder could reach a variety of conclusions concerning White's credibility.  It is conceivable that a reasonable juror would conclude that White is not credible, based on the statements of Huff and McClain, and based on the evidence, assuming there is some, that White and his girlfriend received favorable treatment in their criminal cases based on White's testimony.  It is at least equally conceivable, however, that a reasonable juror would conclude that White was telling the truth, and that Huff and McClain were not.  Notably, Bolling's testimony and some of the physical evidence is consistent with the key points of White's testimony.  This supports a conclusion that White's testimony is credible.  Given such conflicting testimony, a fact finder must make a credibility determination if the fact finder is to choose to rely on a witness's statement in the face of conflicting testimony.  Here, that credibility determination easily and reasonably could have gone in White's favor.

Finally, Murphy Miles' purported confession to the murder of Harrington does not show that it is more likely than not that no reasonable juror would have convicted the Bunton in light of Miles' statement.  Notably, Miles has refused to sign an affidavit, and his purported statement comes to the court via Wymore's hearsay statement.  In the mind of a reasonable fact finder, this fact can be seen as weakening substantially the credibility of Miles' purported statements.   Further, Miles' purported description of how he murdered Harrington is not consistent with much of the physical evidence and is not consistent with the statements of any other witness concerning the circumstances of Harrington's murder.

Considering the trial testimony, Miles' purported statement, and the later statements

of other witnesses, a reasonable fact finder could reach a variety of conclusions concerning Miles' credibility. I find that the most likely conclusion is that Miles simply is not credible. Miles won't sign an affidavit, much of the physical evidence is inconsistent with Miles' statement, and in many ways, Miles' statement is not consistent with the statements of the other witnesses concerning the circumstances of Harrington's murder. Nothing in Miles' purported statement shows that it is more likely than not that no reasonable fact finder would have convicted Bunton in light of the trial testimony, Miles' statement, and the later statements of other witnesses.

### D. Conclusion - Fundamental Miscarriage of Justice

Having examined the parties' arguments, the trial record, all of the new evidence submitted by Bunton, and the applicable law, I conclude that Bunton has not shown that no reasonable fact finder would have convicted Bunton if that fact finder considered both the trial testimony and the new evidence submitted by Bunton. Rather, such a fact finder readily and reasonably could convict Bunton of having murdered Jesse Harrington. Bunton's new evidence and his argument do not demonstrate that he has satisfied the fundamental miscarriage of justice exception as defined in *Schlup v. Delo*, 513 U.S. 298 (1995), *Phillips v. Ferguson*, 182 F.3d 769 (10th Cir. 1999), and related cases. Bunton has not identified evidence that affirmatively demonstrates his innocence. At most, he has identified new evidence that undermines to some extent the finding of guilt against him. Such evidence does not satisfy the fundamental miscarriage of justice standard. *Phillips*, 182 F.3d at 774. I conclude that many reasonable fact finders likely would convict Bunton after considering the trial record and all of the new evidence submitted by Bunton.

### VI.  MERITS OF EXHAUSTED CLAIMS

The magistrate judge concluded that Bunton has exhausted his state court

remedies as to claim one, grounds a), d), e), g), l), j), u), and as to claim thirteen.  I agree with the magistrate judge's analysis and conclusion.  The magistrate judge analyzed the merits of each of the exhausted claims and concluded that Bunton is not entitled to habeas relief on any of these claims.  With one exception, I agree with the magistrate judge's analysis of these claims, and I agree with the magistrate judge's conclusion that Bunton is not entitled to habeas relief on these claims.

Addressing one of Bunton's ineffective assistance of counsel claims, the magistrate judge concluded that the performance of Bunton's trial counsel was constitutionally deficient in one area because trial counsel failed to present a witness, Grace Bursie, to support a defense theory that had been presented to the jury.  *Recommendation*, pp. 42 - 44.  However, the magistrate judge concluded that Bunton is not entitled to relief on this claim because the deficiency in defense counsel's performance did not prejudice the defense.  The respondents have filed an objection [#31], objecting to the magistrate judge's conclusion that defense counsel's performance was constitutionally deficient.  I sustain the respondents' objection.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

**Strickland v. Washington**, 466 U.S. 668, 689 (1984) (quotation and citations omitted).

When cross-examining White, defense counsel asked White several questions

about Grace Bursie.  R, Vol. V, pp. 179 - 187.  White testified that he knew Grace Bursie, that he had tried to help her on certain occasions, and that he took a "sort of big brother-sister attitude with her."  R, Vol. V, p. 179.  White testified also that he remembered Bursie as someone who had dated Bunton, but he denied having told Bursie not to hang out with Bunton, telling Bursie that he (White) could do more for her than Bunton could, or having told Bursie that Bunton would be arrested and charged.  R, Vol. V, pp. 180 - 181.  Defense counsel then noted that, on direct examination, White had denied that he "would put a man behind a murder charge over a woman . . . ."  R, Vol. V, p. 185.  Defense counsel then asked: "Isn't it in fact exactly what you're doing?"  *Id.*  White answered no, and White also denied that his testimony implicating Bunton was all over Grace and White's desire for her.  R, Vol. V, p. 186.  Defense counsel's final question was: "If she [Bursie] came in and said you were doing this [testifying against Bunton] because she would not be with you, she's the one that is lying, not you?"  R, Vol. V, p. 187.  White answered: "That's right."  *Id.*  Again, the defense did not call Grace Bursie as a witness.

At Bunton's Rule 35(c) hearing in the state court, his defense counsel testified that he was reluctant to have Bursie testify because there was some indication that the murder victim, Harrington, was attempting to "break up" Bunton and Bursie.  Defense counsel felt that Bursie's testimony might hurt Bunton by supplying a motive for the murder.  R, Vol. X, pp. 8 - 9.  There was little, if any, evidence at trial to establish a motive for Bunton to kill Harrington.  Bursie was available to defense counsel on the day she would have been called to testify for the defense, but she was not called.  There is nothing in the record that shows what Bursie would have said had she been asked if White was implicating Bunton in an effort to attract Bursie.

I conclude that the decision of Bunton's counsel not to call Bursie falls within the

wide range of reasonable professional assistance, and, thus, was not constitutionally deficient. Bunton's counsel apparently faced uncertainty about what Bursie might say about White's motive to testify against Bunton to get at Bursie. Counsel knew also that Bursie might indicate that Harrington, the victim, was attempting to break up Bunton and Bursie, and that such testimony might establish a motive for Bunton to kill Harrington. Again, there was little, if any, other evidence to demonstrate motive. In this context, counsel's strategic decision not to call Bursie was well within the wide range of reasonable professional assistance and was not constitutionally deficient. On this basis, I sustain the respondents' objection [#31] to the magistrate judge's recommendation.

## VIII. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That the applicant's **Motion for Evidentiary Hearing on the Issue of Whether any Procedural Default Should be Excused Because Mr. Bunton is Actually Innocent** [#44] filed November 26, 2003, is **DENIED**;

2. That the objections stated in **Respondent's objection to Recommendation of United States Magistrate Judge** [#31] filed April 20, 2001, are **SUSTAINED**;

3. That the applicant's objections [#32 & #42] to the magistrate judge's recommendation are **OVERRULED**;

4. That the portion of the **Recommendation of United States Magistrate Judge** [#29], filed April 12, 2001, in which the magistrate judge concludes that defense counsel's performance in failing to present the testimony of Grace Marie Bursie was constitutionally deficient is respectfully **REJECTED**;

5. That I **MODIFY** slightly the standard applied by the magistrate judge in determining whether appellate counsel's failure to raise an issue on direct appeal of a

criminal conviction will be deemed constitutionally deficient and prejudicial, for the purpose of the cause and prejudice analysis, by applying the standard stated in **Neill v. Gibson**, 278 F.3d 1044, 1057 n. 5 (10th Cir. 2001); provided, furthermore, that applying that standard, I otherwise **APPROVE AND ADOPT** the magistrate judge's analysis of this issue;

6.  That otherwise the **Recommendation of United States Magistrate Judge** [#29] filed April 12, 2001, is **APPROVED AND ADOPTED** as an order of this court;

7.  That the applicant's **Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody** [#5] filed November 5, 1999, is **DENIED**; and

8.  That this case is **DISMISSED**.

Dated March 6, 2009, at Denver, Colorado.

BY THE COURT:

Bob Blackburn

Robert E. Blackburn
United States District Judge